**Revised May 3, 1999**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 97-40241**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff - Appellee - Cross-Appellant,**

**VERSUS**

**WALTER MATTHEW THREADGILL, JR.; WALTER MATTHEW
THREADGILL, III; MICHAEL GLENN RIGLER; TIMOTHY
RAY KLEMENT; MARK VICTOR THREADGILL,**

**Defendants - Appellants - Cross-Appellees.**

_____

Appeals from the United States District Court
for the Eastern District of Texas

_____

April 13, 1999

Before REYNALDO G. GARZA, JONES, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

In this appeal we are asked to review the convictions and sentences of five defendants who operated a gambling operation in Gainesville, Texas. We also are presented with a cross-appeal from the government, challenging the district court's decision to depart downward at sentencing. As explained in this opinion, we detect no infirmity in the defendants' convictions or sentences,

and affirm.

I.

On February 15, 1996, a federal grand jury returned a fourteen count indictment charging Walter Matthew Threadgill, Jr. ("Walter Threadgill"), and his sons, Walter Matthew Threadgill, III ("Matthew Threadgill") and Mark Victor Threadgill ("Mark Threadgill"), with various crimes relating to their involvement with an illegal gambling operation in Gainesville, Texas. Also charged in the indictment were codefendants Michael Glen Rigler ("Rigler"), and Timothy Ray Klement ("Klement"), who were closely involved with the Threadgills. Count one of the indictment charged the defendants with conducting an illegal gambling business in violation of 18 U.S.C. § 1955.[1] Count two alleged that the defendants had conspired to commit money laundering in violation of 18 U.S.C. § 1956(h). Counts three through ten charged the defendants with various instances of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i), and with aiding and abetting in the commission of those crimes in violation of 18 U.S.C. § 2. Counts eleven through fourteen were brought against Rigler only, alleging that he structured various

---

[1] On August 14, 1996, the grand jury returned a superseding indictment, alleging the same charges with minor modifications.

financial transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324.

At trial the evidence showed that Walter Threadgill had been a bookmaker since the early 1980s. He started alone, but was later joined by his sons Matt and Mark when the great Texas oil bust hit. That small family business eventually blossomed into a large scale gambling operation that handled millions of dollars in bets every year, and serviced hundreds of bettors in numerous states.[2] Eventually, the Threadgills were joined by Klement, who brought his own bookmaking business to the organization, and Rigler, who was a practicing accountant.

The enterprise was profitably run for several years out of a windowless building in Gainesville, Texas. On an ordinary day the defendants would arrive in the morning, make sure that the game schedules in the computers were accurate, and then obtain various point spreads from a service in Florida. As the day progressed the defendants would take bets over the telephone and would enter the wagers on several computers, which ran on customized software designed to manage wagering. All conversations with bettors were automatically recorded on cassette tapes to avoid later disagreements. Once a week a computer printout was run of the bettors' accounts in order to

---

[2] During a typical month in football season the group would write about $1,000,000 in wagers. Basketball, in comparison, brought in roughly $100,000.

settle the balances.  Generally, bettors were told to make their checks payable to "Tom Johnson," a fictitious person, although some checks were made payable to the individual defendants.

Rigler, who worked for the organization as its accountant, would endorse and deposit the checks in the bank account of Hesperian Investment Corp ("Hesperian"), at North Texas Bank & Trust, a nationally insured bank.  Hesperian was a legitimate business, owned by Rigler and Matthew Threadgill, that made small loans to individuals in advance of their income tax returns. Once the checks from the gambling operation were commingled with Hesperian's money, Rigler would withdraw cash from the account in amounts always less than $10,000.  The proceeds were then divided equally among the other defendants, although some of the money was used to pay the gambling operation's expenses.  For his services, Rigler initially charged $500 a month, which later increased to $700.

In the Fall of 1994, the Texas Department of Public Safety received anonymous tips about the Threadgills' bookmaking operation.  The ensuing investigation revealed that ten telephone lines were being operated in the Threadgills' building, all listed to Cool Water Productions, a defunct corporation.  The investigation also revealed heavy telephone activity at that address:  over 1,600 calls were made to that location in one weekend alone.  In December 1994, the defendants heard rumors

**4**

that the police were investigating their gambling operation. The operation was then temporarily closed, and later reopened in a barn owned by Paul Smith ("Smith"), who also worked for the bookmaking operation. On March 8, 1995, state law enforcement officers searched Smith's residence and arrested Smith and Mark Threadgill for engaging in organized crime in violation of Texas law. In a search of the barn the police recovered gambling computers, cassette tapes, and sports schedules. Additional gambling records and cassette tapes were found in Smith's home and vehicle. When the officers realized how extensive the operation was -- wagers were coming from nineteen states outside of Texas -- federal assistance was requested.

On April 22, 1995, federal officers searched numerous locations related to the gambling operation. Discovered at Walter Threadgill's house were numerous sports schedules and excerpts from the Texas Penal Code, including a copy of Chapter 71 on organized crime, as well as §§ 47.02 through 47.06 of the Code, which covers various gambling activities. At Matthew Threadgill's house the officers found several computer printouts of betting records and sports schedules. At Klement's residence the officers found gambling records, notebooks containing betting information, bettors' names and addresses, and cashier's checks made payable to various bettors. Similar evidence was found at Mark Threadgill's home. A search of the Hesperian offices

produced numerous corporate documents related to the bookmaking operation.  The officers also found carbon copies of cashier's checks made payable to known bettors, and a ledger that tracked the various transactions.

At trial the jury heard 30 taped telephone conversations in which the defendants accepted wagers from their clients.  Several bettors who had been given immunity also testified about their dealings with the defendants.  Several of those bettors were from out of state.  The jury also heard testimony from Smith, who turned government's witness and provided the jury with many details about the gambling operation.  Finally, the jury heard from Rigler's bookkeeper, who stated that at Rigler's behest she commingled checks made payable to "Tom Johnson" with legitimate Hesperian funds.  The jury ultimately found the defendants guilty on count one, the gambling charge, and guilty on count two, the conspiracy charge.  The jury acquitted the defendants on the substantive money laundering offenses alleged in counts three through ten.  Rigler was also found guilty on counts eleven through fourteen, the unlawful structuring counts.

The district court subsequently sentenced each of the defendants to 42 months imprisonment.  Although their respective guideline ranges varied, the district court arrived at that uniform sentence by departing downward as to each defendant under U.S.S.G. § 5K2.0.  The defendants now appeal their convictions.

Mark Threadgill is the only defendant that appeals his sentence. The government cross-appeals, contending that the district court erred in departing downward.

## II.

The defendants contend that their convictions must be set aside because federal agents used gambling tax records kept by the organization to secure search warrants and to later obtain a grand jury indictment. The defendants assert that the federal agents' use of those records abridged their Fifth Amendment rights against self-incrimination, and also violated the statutory requirements of 26 U.S.C. § 4424(c).

Walter Threadgill raised this argument in a motion to suppress filed in the district court, which was subsequently adopted by each of his codefendants. The district court, after holding a hearing, denied the motion in a written order. In reviewing a district court's denial of a defendant's motion to suppress, we review factual findings for clear error and conclusions of law *de novo*. *See **United States v. Carrillo-Morales***, 27 F.3d 1054, 1060-61 (5th Cir. 1994), *cert. denied*, 513 U.S. 1178 (1995). Additionally, we review the evidence in the light most favorable to the prevailing party which, in this case, is the government. ***United States v. Ishmael***, 48 F.3d 850, 853 (5th Cir.), *cert. denied*, 516 U.S. 818

**7**

(1995).

Under federal law, persons who unlawfully accept wagers must nevertheless pay an excise tax equal to two percent of the unauthorized wagers. 26 U.S.C. §§ 4401 & 4411. That tax must be paid on a monthly basis, and must be reported on what is known as an IRS Form 730. 26 C.F.R. § 44.6011(a)(1)(a). To assist the IRS in determining whether a taxpayer has correctly stated his taxes, the taxpayer must "keep a daily record showing the gross amount of all wagers on which he is so liable." 26 U.S.C. § 4403.

There are limits, however, on the extent to which those records may be used against a taxpayer. Under § 4424(a) of the Internal Revenue Code, officials or employees of the Treasury Department are forbidden from divulging the tax records.[3] 26

---

[3] Section 4424(a) provides:

(a) General rule.--Except as otherwise provided in this section, neither the Secretary nor any other officer or employee of the Treasury Department may divulge or make known in any manner whatever to any person--
  (1) any original, copy, or abstract of any return, payment, or registration made pursuant to this chapter,
  (2) any record required for making any such return, payment, or registration, which the Secretary is permitted by the taxpayer to examine or which is produced pursuant to section 7602, or
  (3) any information come at by the exploitation of any such return, payment, registration, or record.

U.S.C. § 4424(a).  Moreover, § 4424(c) prohibits the use of certain gambling tax records "in any criminal proceeding."[4]  An added constraint also flows from the Fifth Amendment, which protects every person from being "compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  With those principles in mind, we turn to the particular facts of this case.

On March 8, 1995, two search warrants were executed by state law enforcement officers on Smith's residence, barn, and vehicle. The search produced computers, ledgers, tape recordings of telephone calls with bettors, address books containing coded information on bettors, and numerous sports schedules.  The evidence was eventually turned over to federal authorities who then applied for a search warrant with an affidavit summarizing

---

26 U.S.C. § 4424(a)

[4]      Section 4424(c) provides:

(c) Use of documents possessed by taxpayer.--
Except in connection with the administration
or civil or criminal enforcement of any tax
imposed by this  title--
   (1) any stamp denoting payment of the
   special tax under this chapter,
   (2) any original, copy, or abstract
   possessed by a taxpayer of any return,
   payment, or registration made by such
   taxpayer pursuant to this chapter, and
   (3) any information come at by the
   exploitation of any such document,
shall not be used against such taxpayer in
any criminal proceeding.

26 U.S.C. § 4424(c).

the evidence. The acting magistrate judge granted the application, and the resulting search by the federal agents uncovered more incriminating evidence: additional gambling records in the form of computer printouts, financial ledgers, and a notebook containing bettors' names and addresses. The federal agents then used the evidence to obtain the grand jury indictment that gave rise to the present action.

In their motion to suppress, the defendants argued that the gambling records were kept for the specific purpose of complying with the federal tax laws. The defendants thus reasoned that the federal agents' subsequent use of those records violated their rights under the Fifth Amendment and § 4424(c). Notably, the defendants explicitly limited their argument to the seized computer records, two ledgers, and 170 tape recordings.

In denying the motion, the district court found that the defendants' Fifth Amendment rights had not been violated because the challenged materials were not the types of records compelled by the tax statutes. The court observed that the computer records were irreversibly purged every two weeks, strongly suggesting that they were not used for tax purposes. Similarly, the court found that the defendants permanently erased information on the cassette tapes by routinely taping over conversations. As for the two ledgers, the district court found that one was used simply to account for checks taken to Rigler,

while the other was used to keep track of bettors' accounts.

On those facts the district court concluded that the gambling records were kept to further the gambling business, not to comply with federal tax laws. We agree. The record plainly establishes that the defendants used the gambling records to better the profitability of their criminal enterprise. There is little, if any, evidence that the gambling records were actually used for a law-abiding purpose. We affirm the district court's denial of the motion to suppress.

                                III.

The defendants contend that the superseding indictment was deficient with respect to count two, the conspiracy charge. We review *de novo* a challenge to the sufficiency of an indictment. **United States v. Fitzgerald**, 89 F.3d 218, 221 (5th Cir.), *cert. denied*, 117 S. Ct. 446 (1996). Generally, we measure the sufficiency of an indictment "by whether (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, without any uncertainty or ambiguity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." **United States v. Lavergne**, 805 F.2d 517, 521 (5th Cir. 1986) (citing **United States v. Gordon**, 780 F.2d 1165, 1171-72 (5th Cir. 1986)). The elements of the offense of conspiracy to commit

**11**

money laundering are: (1) that there was an agreement between two or more persons to commit money laundering; and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose.[5] *United States v. Garcia Abrego*, 141 F.3d 142, 163-64 (5th Cir.), *cert. denied*, 119 S. Ct. 182 (1998).

On appeal, the defendants argue that count two is flawed because it fails to recite two necessary elements of the crime. First, the defendants contend that the count fails to allege that they knew the specified property represented the proceeds of unlawful activity. Second, they assert that the count fails to allege that the defendants knew the specified unlawful activity, illegal gambling, was a felony.[6]

Count two cites the applicable statute for conspiracy to

---

[5] Presently, there is an open question in this Circuit as to whether conspiracy to commit money laundering under 18 U.S.C. § 1956(h) requires proof of an overt act in furtherance of the conspiracy as one of its required elements. The Supreme Court has held that a conviction for conspiracy to commit a drug offense in violation of 21 U.S.C. § 846 does not require an overt act. *See United States v. Shabani*, 513 U.S. 10, 15 (1994). As we have recognized on a previous occasion, the language of § 846 is nearly identical to the language of § 1956(h), and neither the Supreme Court nor this Court has squarely decided whether § 1956(h) also lacks an overt act requirement. *United States v. Garcia Abrego*, 141 F.3d 142, 163-64 (5th Cir.), *cert. denied*, 119 S. Ct. 182 (1998). We need not address that issue here, however, because even if an overt act is an element of § 1956(h), count two of the superseding indictment alleges several overt acts.

[6] Each of the defendants raised this challenge in the district court in a joint motion to dismiss count two of the superseding indictment.

commit money laundering, 18 U.S.C. § 1956(h), and proceeds to

charge the defendants with the necessary elements of that

offense.[7]  Critically, the wording of the charge is sufficiently

specific to apprise the defendants of the charged crime, and to

protect them from subsequent prosecution for the same offense.

*See* **Lavergne**, 805 F.2d at 521 (5th Cir. 1986) (setting forth the

criteria for determining the validity of an indictment).

The defendants' argument is unavailing because the two

elements the defendants claim are missing from count two are not

even elements of the crime of conspiracy.  *Cf.* 18 U.S.C. §

1956(h) (statutory language not reflecting these elements);

**Garcia Abrego**, 141 F.3d at 163-64 (5th Cir. 1998) (setting forth

---

[7]     Count two provides in pertinent part:

> [the defendants] did knowingly, unlawfully,
> and willfully combine, conspire, confederate,
> and agree with each other . . . to conduct
> and attempt to conduct financial transactions
> affecting interstate commerce, which involved
> the proceeds of a specified unlawful
> activity, that is:
>> An illegal gambling business in
>> violation of Title 18, United States
>> Code § 1955 and more completely
>> described in Count One;
> a.   With the intent to promote the carrying
> on of specified unlawful activity; and,
> b.   Knowing that the transaction was
> designed in whole or in part to conceal and
> disguise the nature, location, source,
> ownership and control of the proceeds from
> specified unlawful activity;
>> In violation of Title 18, United States
> Code § 1956(a)(1)(A)(i) and (B)(i).

list of elements that does not include defendants' claimed elements). The claimed elements go instead to the substantive crime of money laundering. 18 U.S.C. § 1956; *see also* **United States v. Burns**, 162 F.3d 840, 847 (5th Cir. 1998) (stating that the government must prove (1) conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of unlawful activity, and (3) which the defendant knew was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity). The critical error in the defendants' position is its presumption that a conspiracy charge must also describe the legal elements that comprise the substantive crime that is the object of the conspiracy. It is settled law that conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy. **United States v. Nims**, 524 F.2d 123, 126 (5th Cir. 1975), *cert. denied*, 426 U.S. 934 (1976). Thus, we have consistently held that a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit. **United States v. Fuller**, 974 F.2d 1474, 1479-80 (5th Cir. 1992), *cert. denied*, 510 U.S. 835 (1993); **United States v. Graves**, 669 F.2d 964, 968 (5th Cir. 1982). Accordingly, the defendants' attempt to challenge count two by referencing the elements of money laundering is improper. We

**14**

reject the claim that count two is defective.[8]

## IV.

The defendants jointly argue that the district court's jury instructions were defective.  Rigler and Mark Threadgill also bring separate, individual challenges to the jury instructions. We review each argument in turn.

## A.

The defendants jointly contend that the district court erred by giving the jury a "deliberate ignorance" instruction when there was insufficient evidence to support its submission.  We review challenges to jury instructions by determining "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." **United States v. Stacey**, 896 F.2d 75, 77 (5th Cir. 1990) (citation and quotation omitted).  "A district court has broad discretion in framing the instructions to the jury and this Court will not reverse unless the instructions taken as a whole do not correctly reflect the issues and law." **United States v. Moser**, 123 F.3d 813, 825 (5th Cir.) (citation and quotation omitted), *cert.*

_____

[8]    The defendants contend that the jury instructions were defective for the same reasons.  We reject that argument as well.

**15**

*denied*, 118 S. Ct. 613 (1997).

At trial the defendants claimed that they lacked the necessary criminal intent because they did not know that their gambling activities were a felony. *See* 18 U.S.C. § 1956(c) (establishing the felony-knowledge requirement for money laundering, that is, knowledge that the laundered property represents proceeds from a felony under state, federal, or foreign law). Accordingly, in its charge to the jury the district court instructed that:

> The fact of knowledge or willfulness may be established by direct or circumstantial evidence. The element of knowledge or willfulness may be satisfied by inference drawn from proof that a Defendant closed his eyes to or acted in deliberate ignorance of what would otherwise have been obvious to him. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.

The district court placed the instruction at the end of the jury instructions in a general section that explained the various mens rea requirements. As such, the deliberate ignorance instruction applied to all of the counts in the superseding indictment.[9]

On appeal, the defendants assert that the district court's use of the deliberate ignorance instruction was an abuse of discretion because the evidence at trial did not satisfy the legal requirements for invoking the charge. We look first to the

---

[9] The appellants timely objected to the deliberate ignorance instruction in the district court.

general principles that guide the use of a deliberate ignorance instruction.

A deliberate ignorance charge is intended "to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990). It is only to be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference. *United States v. Wisenbaker*, 14 F.3d 1022, 1027 (5th Cir. 1994). Although we have stated that a deliberate ignorance instruction "should rarely be given," *United States v. Ojebode*, 957 F.2d 1218, 1229 (5th Cir. 1992), *cert. denied*, 507 U.S. 923 (1993), we also have "consistently upheld such an instruction as long as sufficient evidence supported its insertion into the charge." *United States v. Daniel*, 957 F.2d 162, 169 (5th Cir. 1992). The instruction is proper where the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct. *United States v. Cavin*, 39 F.3d 1299, 1310 (5th Cir. 1994).

The defendants assert that the use of the deliberate ignorance instruction was improper in this case because there was no evidence that the defendants were subjectively aware, to a high probability, that their gambling operation was a felony.

The defendants also maintain that there was no evidence that they purposefully contrived to avoid learning that fact.  There are serious flaws in the defendants' position.

The basic thrust of the defendants' argument is that the deliberate ignorance instruction should not have been used to assist the jury in determining whether the defendants knew their gambling operation was a felony.  That assertion, of course, is only relevant to counts three through ten, the substantive money laundering counts, since those are the only counts in the superseding indictment which carry that particular mens rea requirement.  *Compare* 18 U.S.C. § 1956(a), *with* 18 U.S.C. § 1955, *and* 18 U.S.C. § 1956(h), *and* 31 U.S.C. § 5324.  Thus, the first flaw in the defendants' argument is that it overlooks the fact that the jury acquitted the defendants on counts three through ten.  Whether the deliberate ignorance instruction was properly submitted with respect to the money laundering counts is an interesting, but irrelevant, question.

However, even if we generously construe the defendants' argument as a challenge to the deliberate ignorance instruction as applied to all of the counts in the superseding indictment, we still must reject the contention.  We concede, after reviewing the record, that there is little evidence that the defendants purposefully contrived to avoid knowing that their actions were unlawful.  In fact, the evidence reveals just the opposite, that

**18**

the defendants knew that their conduct was criminal and took elaborate measures to hide it.  Thus, we must conclude that the district court erred by including the deliberate ignorance instruction in the jury instructions.  However, it is the evidence of actual knowledge that proves fatal to the defendants' claim.  We have consistently held that an "error in giving the deliberate ignorance instruction is . . . harmless where there is substantial evidence of actual knowledge." *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993), *cert. denied*, 513 U.S. 1060 (1994); *United States v. Breque*, 964 F.2d 381, 388 (5th Cir.1992), *cert. denied*, 507 U.S. 909 (1993).  Accordingly, even if we construe the defendants' argument liberally, and find that the district court erred in giving the deliberate ignorance instruction, the error was harmless.

B.

Rigler was the only defendant charged and convicted of structuring transactions to evade reporting requirements in violation 31 U.S.C. § 5324(a)(3).  On appeal Rigler challenges the deliberate ignorance instruction as it relates to those convictions.  Specifically, he contends that the use of the instruction was improper as a matter of law because it violated the Supreme Court's holding in *Ratzlaf v. United States*, 510 U.S. 135 (1994).  In *Ratzlaf*, the Supreme Court held that a defendant

**19**

may be convicted of violating § 5324 only on a showing that the defendant "willfully" violated anti-structuring laws. *Id.* at 136-38. According to the Court, the government must "prove that the defendant acted with knowledge that his conduct was unlawful" in order to prove a "willful" violation of § 5324. *Id.* at 137.

Rigler maintains that under *Ratzlaf* the government was required to prove that he had particularized knowledge; in other words, that he knew that the subject transactions were in violation of § 5324. He then asserts that the district court's deliberate ignorance instruction conflicts with *Ratzlaf* because it lessens the government's burden. In Rigler's view, the instruction allowed the government to secure his conviction on mere evidence that he knew, only in a general sense, that structuring was against the law. We do not agree.

Our review of the jury instructions reveals that the district court correctly explained the law with respect to the unlawful structuring counts, and did not lessen the government's burden under *Ratzlaf*. Although we base our conclusion on the jury instructions as a whole, we call attention to a particular provision that significantly undermines Rigler's claim:

> if you find beyond a reasonable doubt that
> the defendant *structured a transaction* in
> currency with a financial institution, that
> the defendant did so *for the purpose of
> evading* the transaction reporting
> requirement, and that the defendant *knew that
> the structuring itself was unlawful*, then you

**20**

should find the defendant guilty as charged. (emphasis added.) Parsed, that statement required proof beyond a reasonable doubt that "the defendant structured a transaction . . . for the purpose of evading the transaction reporting requirement . . . [knowing] that the structuring itself was unlawful." In that way, it permitted a conviction under § 5324 only upon evidence that Rigler knew the particular structuring transactions were in violation of § 5324. We reject Rigler's claim that the deliberate ignorance instruction reduced the government's burden under *Ratzlaf*.

C.

Mark Threadgill contends that his convictions must be reversed because the jury instructions constructively amended the superseding indictment. He raises that issue for the first time on appeal, so we must review it under our plain error standard. *United States v. Rogers*, 126 F.3d 655, 660 (5th Cir. 1997). Under that doctrine, a defendant must show (1) the existence of actual error; (2) that the error was plain; and (3) that it affects substantial rights. *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc). Applying this stringent standard to the facts of this case, we cannot conclude that plain error occurred.

"The Fifth Amendment guarantees that a criminal defendant

**21**

will be tried only on charges alleged in a grand jury indictment." *United States v. Arlen*, 947 F.2d 139, 144 (5th Cir. 1991), *cert. denied*, 503 U.S. 939 (1992).  As a result, "[t]he indictment cannot be 'broadened or altered' except by the grand jury."  *Id.* (citations omitted).  "A constructive amendment occurs when the trial court, through its instructions and facts it permits in evidence, allows proof of an essential element of a crime on an alternative basis permitted by the statute but not charged in the indictment."  *Id.* (citation and quotation omitted).  Normally, a constructive amendment is considered prejudicial *per se* and grounds for reversal of a conviction. *United States v. Fletcher*, 121 F.3d 187, 192 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 640 (1997). However, if a defendant raises a claim of constructive amendment for the first time on appeal, we nonetheless have the discretion to deny the claim. *Id.; United States v. Reyes*, 102 F.3d 1361, 1364-66 (5th Cir. 1996).

Mark Threadgill's allegations regarding a constructive amendment are advanced with suspect reasoning.  He starts by noting that the jury instructions for count two, the conspiracy charge, reference the money laundering instructions for counts three through ten.  He next observes that the jury instructions for counts three through ten allege three state law crimes as possible underlying felonies, a required element of money

**22**

laundering, 18 U.S.C. § 1956, and notes that those same crimes have not been alleged in the corresponding counts in the indictment.  He then leaps to the conclusion that a constructive amendment occurred, without addressing what relevance a constructive amendment on the money laundering counts, which resulted in an acquittal, would have on the conspiracy charge in count two.  Having looked at that question ourselves, we conclude that any constructive amendment which did occur had no legal bearing on Mark Threadgill's conspiracy conviction under count two.

Mark Threadgill makes a colorable argument that the jury instructions for money laundering constructively amended the corresponding money laundering counts in the superseding indictment.  However, we do not see what legal relevance that has to Mark Threadgill's conspiracy conviction.  As noted, the elements for proving the crime of conspiracy are separate and distinct from the elements needed to establish the substantive offense of money laundering.  *See Nims*, 524 F.2d at 126. Therefore, while the purported amendment may have impermissibly broadened the money laundering counts in the superseding indictment by alleging three new state crimes that could satisfy the underlying felony requirement of § 1956, that specific amendment could not have broadened the conspiracy charge, which has an entirely different set of elements.  *See Garcia Abrego*,

141 F.3d at 163-64 (providing that elements of money laundering are (1) agreement between two or more persons to commit money laundering, and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose).  Thus, if the jury instructions for counts three through ten worked a constructive amendment, they did so only with respect to the money laundering counts.  We find no error that warrants relief under our plain error standard.

V.

The defendants contend that the district court erred in failing to dismiss the superseding indictment because the gambling, money laundering, and unlawful structuring counts are worded in a manner that violates the federal Commerce Clause. The defendants also argue that the jury instructions are flawed for the same reason.

We note as an initial matter that the defendants were acquitted on counts three through ten, the money laundering counts.  Thus, we limit our consideration to whether the superseding indictment and jury instructions allege the gambling and unlawful structuring counts in a manner inconsistent with the Commerce Clause.  We begin that inquiry with a review of the elements of those offenses.

The elements of the crime of illegal gambling are (1) the

**24**

existence of a gambling business which is illegal under the laws of the state in which it is conducted; (2) the involvement of five or more persons in the operation of the business; and (3) the substantially continuous operation of the business for a period in excess of 30 days, or, gross revenues of $2,000 in any single day.  18 U.S.C. § 1955; *United States v. Tucker*, 638 F.2d 1292, 1294 (5th Cir.), *cert. denied*, 454 U.S. 833 (1981).  The elements of the crime of unlawful structuring were, at the time of the offenses in question, (1) that the defendant willfully and knowingly structured a currency transaction; (2) with the purpose of evading the reporting requirements; (3) the transaction involved one or more domestic  financial institutions; and (4) the defendant knew that the structuring was unlawful.[10]  31 U.S.C. § 5324; *see also Ratzlaf v. United States*, 510 U.S. 135 (1994).

In this case, the superseding indictment and jury instructions carefully track the language of the gambling and unlawful structuring statutes, accurately reciting all of the generally recognized elements of those offenses.  The defendants,

---

[10]     After *Ratzlaf*, Congress expressly overruled the Court's decision by passing a new statute, 31 U.S.C. § 5324 (1994), making plain that knowledge of the law against structuring was not required for guilt.  See H.R. Rep. No. 103-438, at 22 (1994) (stating that § 5324 restores Congress' clear intent that currency reporting crime requires only an intent to evade reporting requirements, not proof that the defendant knew that structuring was illegal).

however, insist that the counts are constitutionally infirm because they fail to allege that the charged conduct had a "substantial effect on interstate commerce," as that term was explained in *United States v. Lopez*, 514 U.S. 549 (1995). They assert that after *Lopez* the federal government cannot prohibit individual conduct without proving that jurisdictional element. The defendants' interpretation of *Lopez* is incorrect.

In *Lopez*, the Supreme Court struck 18 U.S.C. § 922(q)(1)(A), a statute which prohibited "'any individual knowingly to possess a firearm at a place [he] knows . . . is a school zone,'" as an unconstitutional exercise of Congress' power under the Commerce Clause. *Id.* at 551. That power, the Court observed, only extends to three types of activity: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) those activities having a substantial relation to interstate commerce, namely, those activities that substantially affect interstate commerce. *Id.* at 558-59. Since § 922(q)(1)(A) did not involve channels or instrumentalities of interstate commerce, the Court reasoned that the statute would be constitutional only if it qualified under the third category, as a statute that regulated an activity which substantially affected interstate commerce. *Id.* at 559.

In considering that question, the Court recognized that its

**26**

case law had not always been clear as to whether an activity must "affect" or "substantially affect" interstate commerce. The Court then explained that "consistent with the great weight of our case law . . . the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at 559. Having clarified that point, the Court concluded that several critical factors prevented § 922(q)(1)(A) from qualifying as a valid exercise of congressional authority under the third category. First, since § 922(q)(1)(A) did not regulate a commercial activity, the statute could not be upheld as regulating "activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* at 561. Further, the statute contained no "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce." *Id.* Finally, the statute was not supported by specific "congressional findings [that] would enable [the Court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye." *Id.* at 563.

On appeal, the defendants essentially argue that *Lopez* has created a new jurisdictional element in all federal prosecutions of individual conduct. That element would require the government

**27**

to plead and prove that the charged conduct "substantially affected" interstate commerce. We are not persuaded. *Lopez* is significant because it limits Congress' ability to regulate intrastate activities not related to the channels or instrumentalities of interstate commerce. But contrary to the defendants' contention, nothing in *Lopez* purports to announce any broader rule.[11]

Whether a defendant's conduct has a "substantial effect on interstate commerce" is a question that only becomes relevant when the statute at issue, or the facts of the case, cast doubt on Congress' ability to use the Commerce Clause to regulate the charged conduct. In this case neither circumstance is present. Unlike the Gun Free Zones Act in *Lopez*, the gambling and unlawful structuring statutes regulate purely commercial activities.[12] Also, the facts of this case indicate that the defendants actually engaged in significant interstate activity in furtherance of their gambling operation. Accordingly, we reject the defendants' claim that the gambling and structuring counts

---

[11]    The defendants have failed to cite a single case that supports their novel interpretation of *Lopez*.

[12]    Furthermore, § 1955 contains a jurisdictional element that ensures a sufficient jurisdictional nexus on a case-by-case basis. *See* 18 U.S.C. § 1955(b). Also, the gambling statute is supported with express congressional findings that have prompted this Court to affirm the constitutionality of § 1955, *see United States v. Harris*, 460 F.2d 1041, (5th Cir.) (finding § 1955 valid exercise of Commerce Clause power after summarizing legislative history), *cert. denied*, 409 U.S. 877 (1972).

are invalid under *Lopez* for not alleging a "substantial effect on interstate commerce."

VI.

Finally, Klement argues that count one of the superseding indictment, the gambling count, was defective because it did not cite the particular state statute that the defendants allegedly violated. *See* 18 U.S.C. § 1955(b) (requiring the existence of a gambling business that is illegal under state law). Normally, this Court applies a *de novo* standard of review to a district court's finding that an indictment is sufficient. ***United States v. Fitzgerald***, 89 F.3d 218, 221 (5th Cir.), *cert. denied*, 117 S. Ct. 446 (1996). But because Klement raised this issue after trial, the indictment must be liberally construed in favor of validity, "unless it is so defective that by any reasonable construction, it fails to charge an offense for which the defendant is convicted." ***United States v. Salinas***, 956 F.2d 80, 82 (5th Cir. 1992) (citations and quotations omitted).

As we have explained, a person violates § 1955 if he operates an "illegal gambling business . . . [in] violation of the law of a State . . . in which it is conducted." 18 U.S.C. § 1955(b)(1). In this case, the superseding indictment tracked the language of § 1955, recited all of its necessary elements, and alleged that the defendants operated a "bookmaking business" that

**29**

"violated the laws of the State of Texas."  As Klement points out, however, it did not specifically cite the Texas statute that prohibits bookmaking.  That argument need not detain us long.

The Federal Rules of Criminal Procedure provide that the failure to cite a statute in an indictment "shall not be ground for  . . . reversal of a conviction if the error or omission did not mislead the defendant to the defendant's prejudice."  Fed. R. Crim. P. 7(c)(3).  Moreover, this Court has recognized that "to be sufficient, an indictment needs only to allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." *United States v. Webb*, 747 F.2d 278, 284 (5th Cir. 1984).  The test for the validity of an indictment is "not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Id.*

Here, the Texas Penal Code criminalizes bookmaking in only one location  *See* Tex. Penal Code Ann. § 47.03(2).  Thus, in light of the fact that the superseding indictment expressly alleged the crime of "bookmaking," the defendants must have known that they were being charged with violating § 47.03 of the Texas Penal Code.  The superseding indictment's identification of the state offense provided adequate notice.  Thus, Klement was not prejudiced by the superseding indictment's failure to expressly

30

cite the statutory provision.  We reject Klement's challenge to count one of the superseding indictment.

VII.

In its cross-appeal, the government challenges the district court's decision to downwardly depart at to each defendant's sentence.  As a general rule, when a case before a district court is a typical one, the court must impose a sentence within the applicable Sentencing Guidelines range.  18 U.S.C. § 3553(a); *United States v. Arce*, 118 F.3d 335, 338 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 705 (1998).  However, the Sentencing Commission recognized that unusual cases would arise requiring special consideration.  *See* U.S.S.G. Ch. 1, Pt. A, intro. comment 4(b).  Thus, the district courts were reposed with a significant measure of sentencing discretion for cases with atypical or unusual circumstances.  The Commission explained:

> The Commission intends the sentencing courts
> to treat each guideline as carving out a
> "heartland," a set of typical cases embodying
> the conduct that each guideline describes.
> When a court finds an atypical case, one to
> which a particular guideline linguistically
> applies but where conduct significantly
> differs from the norm, the court may consider
> whether a departure is warranted.

*Id.*  That intent has been codified in 18 U.S.C. § 3553(b), which provides that a district court may depart from the applicable guideline range when it "finds that there exists an aggravating

31

or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). In determining whether a circumstance was adequately taken into consideration by the Sentencing Commission, our inquiry is limited to the Sentencing Guidelines, policy statements, and official commentary of the Commission. 18 U.S.C. § 3553(b). In this appeal, the government alleges that the facts of this case do not support the district court's determination that the defendants' case was "outside the heartland" of money laundering cases. To properly consider that claim, we must first set forth the basic framework for analyzing a district court's decision to depart.

After the Supreme Court's landmark decision in *Koon v. United* **States**, 518 U.S. 81 (1996), our analysis of a district court's decision to depart consists of three separate determinations.[13] An appellate court must ask: (1) whether the

_____

[13] Before **Koon**, this Court utilized a two-step inquiry based on the Supreme Court's decision in ***Williams v. United States***, 503 U.S. 193 (1992). ***See United States v. Kay***, 83 F.3d 98, 100-01 (5th Cir. 1996). That approach asked (1) whether the sentence was imposed either in violation of law or as a result of an incorrect application of the Guidelines; and (2) whether the sentence is an unreasonable departure from the computed guideline range. ***Id.*** In **Koon**, the Supreme Court elaborated at length on the first step of that approach. In this opinion we have refined our two-step approach to incorporate **Koon's** teachings.

factors relied on by the district court for departure are permissible factors under the Guidelines; (2) whether the departure factors, as supported by evidence in the record, remove the case from the heartland of the applicable guideline; and (3) whether the degree of departure is reasonable. *See United States v. Whiteskunk*, 162 F.3d 1244, 1249 (10th Cir. 1998) (recognizing the same determinations, although dividing them into four separate inquiries). In this case, the parties' arguments center on the first two questions, so that is where we turn our attention.

### A.

The first question an appellate court must ask is whether a particular factor relied on by the district court is a permissible factor for departure under the Guidelines. *See Koon*, 518 U.S. at 92-96. In addressing that question, we start with the basic rule that a district court may depart based on circumstances "not adequately taken into consideration" by the Sentencing Commission. 18 U.S.C. § 3553(b). But how do we determine whether a given factor has been adequately considered by the Commission? *Koon* speaks to that question at length.

In *Koon*, the Supreme Court explained that a court must specifically look to whether the departure factor is forbidden, encouraged, discouraged, or unmentioned by the Guidelines. *Id.*

**33**

at 94-96; *United States v. Winters*, 105 F.3d 200, 205-06 (5th Cir. 1997). If the factor is expressly forbidden in the Guidelines, *Koon* instructs that the sentencing court is completely precluded from using it as a basis for departure. *Koon*, 518 U.S. 95-96. However, the Court noted that the Sentencing Commission "chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations which might bear on the decision to depart." *Id.* at 94. Thus, *Koon* makes clear that except for a limited number of forbidden factors, the Guidelines do not limit the kinds of factors that could constitute grounds for a departure. *See also* U.S.S.G. Ch. 1, Pt. A, intro. comment 4(b) (indicating that the Commission "does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case"). Thus, a district court must not be precluded, categorically, from considering a factor unless the use of that factor is plainly foreclosed by the Guidelines. *United States v. Green*, 152 F.3d 1202, 1207 (9th Cir. 1998).

If the departure factor is not forbidden, the district court may presumably depart on that factor although the appropriate circumstances will vary depending on whether the factor is encouraged, discouraged, or unmentioned. *Koon*, 518 U.S. at 94-96. If a factor is encouraged, courts can depart only "if the

**34**

applicable Guideline does not already take it into account." *Id.*
at 96. If the factor is discouraged, or encouraged but already
taken into account by the applicable guideline, courts can depart
"only if the factor is present to an exceptional degree or in
some other way makes the case different from the ordinary case
where the factor is present." *Id.* If the factor is unmentioned,
"the court must, after considering the 'structure and theory of
both relevant individual guidelines and the Guidelines taken as a
whole' . . . decide whether [the factor] is sufficient to take
the case out of the Guideline's heartland." *Id.* (quoting *United
States v. Rivera*, 994 F.2d 942, 949 (1st Cir. 1993)).

So, whether a given factor is permissible depends on how the
factor is classified. An impermissible factor is a forbidden
factor, a discouraged factor not present to an exceptional
degree, or an encouraged factor already considered by the
Guidelines and not present to an exceptional degree. *Id.* at 94-
96. All other factors cannot be precluded categorically as a
possible basis for departure. *Id.* at 94. These rules comprise
the method by which we determine whether a particular factor is a
permissible ground for departure under the Guidelines. However,
we are still left with the question of what deference to accord
various aspects of district court's decision. Fortunately, *Koon*
speaks to that point as well.

B.

In *Koon* the Supreme Court fashioned a straightforward rule that guides appellate review:  "[t]he deference that is due depends on the nature of the question presented."  *Id.* at 98.  Thus, when the question presented by the district court's decision to depart is legal in nature, the appellate court gives no deference to the district court.  *Id.* at 100.  For instance, "whether a factor is a permissible basis for departure under any circumstances is a question of law, and the court of appeals need not defer to the district court's resolution on the point."  *Id.* at 100; *United States v. Hemmingson*, 157 F.3d 347, 360 (5th Cir. 1998).

When the question presented to the appellate court is factual, on the other hand, appellate review must accord substantial deference to the district court's decision to depart. *Koon*, 518 U.S. at 97-99; *United States v. Collins*, 122 F.3d 1297, 1302-33 (10th Cir. 1997).  Deference is required "to afford the district court the necessary flexibility to resolve questions involving 'multifarious, fleeting, special, narrow facts that utterly resist generalization.'"  *Koon*, 518 U.S. at 99 (citation and quotation omitted).  As the Court explained in *Koon*, most departure cases hinge on factual determinations, and thus fall within this category: "[a] district court's decision to depart from the guidelines . . . will in most cases be due substantial

**36**

deference, for it embodies the traditional exercise of discretion by the sentencing court." *Id.* at 98.  As such, an appellate court must expect that in many instances:

> The district court's [decision to depart] . . . will not involve a 'quintessentially legal' interpretation of the words of a guideline, but rather will amount to a judgment about whether the given circumstances, as seen from the district court's unique vantage point, are unusual, ordinary or not ordinary, and to what extent.

*Rivera*, 994 F.2d at 951.  But when are the particular circumstances of a case so unusual as to warrant a departure under the Guidelines?  That question takes us to the second determination an appellate court must make when reviewing a district court's decision to depart.


C.

After determining whether a departure factor relied on by the district court was permissible, the appellate court must ask whether the given factor is present to a degree not adequately considered by the Commission.  *Koon*, 518 U.S. at 98.  In other words, are the circumstances of the case so unusual as to remove the case from the heartland?  *Id.* ("Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline.").  In *Koon* the Supreme Court explained that this question is largely within the province of the district court.

*Id.* at 97-99.  The Court observed that "[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations."  *Id.* at 98.  The Court further added that "[t]o resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing."  *Id.*

*Koon* thus teaches that when a district court decides to depart based on the particular facts of a case, it is acting within its special competence.  *Id.* at 99 ("To ignore the district court's special competence -- about the 'ordinariness' or 'unusualness' of a particular case' -- would risk depriving the Sentencing Commission of an important source of information, namely, the reactions of the trial judge to the fact-specific circumstances of the case." (citation and quotation omitted)); *see also Hemmingson*, 157 F.3d at 361 ("*Koon* also stresses that courts of appeals owe considerable deference in reviewing a decision to depart").  Accordingly, it is the near-exclusive province of the district court to decide whether a particular factor, or set of factors, removes a case from the applicable heartland.  We must accord those decisions the greatest deference.

To summarize our departure principles in the context of the present case, we first must determine whether the departure

**38**

factors relied on by the district court were permissible.  *Koon*

tells us that we need not defer to the district court on that

question.  We next must determine whether those factors, if

permissible, were sufficient to remove the case from the

applicable heartland.  *Koon* teaches that the district court's

resolution of that question must be accorded substantial

deference on appeal.  We now apply this analysis to the case

before us.


D.

In the present action, the district court cited two separate

factors in support of its decision to depart.  The court first

found that the defendants' money laundering activities were

incidental to the gambling operation.  The court next found that

the defendants' conduct was atypical because the defendants never

used the laundered money to further other criminal activities.

Based on those two factors, the district court departed downward

under U.S.S.G. § 5K2.0, sentencing each of the defendants to 42

months imprisonment.

In reviewing the district court's decision to depart, we

first must determine whether the district court relied on

permissible departure factors.  As instructed, we turn to the

Guidelines Manual to see whether the two factors cited by the

district court are forbidden, encouraged, discouraged, or

unmentioned.  *Koon*, 518 U.S. at 94-96; *Hemmingson*, 157 F.3d at 360-61.  Sections 5H1 and 5K2 of the Guidelines list numerous factors that a district court may, or may not, take into account in deciding whether to depart.  *See* U.S.S.G. §§ 5H1 & 5K2. Neither of the two factors relied on by the district court in this case are mentioned in those provisions.  Thus, since neither of the factors are expressly forbidden by the Guidelines, under *Koon* the district court cannot be precluded, as a categorical matter, from relying on those factors.  *Koon*, 518 U.S. at 94.

The government contends, however, that the district court's first factor, that the money laundering was incidental to the gambling operation, must be declared impermissible based on this Court's holding in *United States v. Willey*, 57 F.3d 1374, 1392 (5th Cir.), *cert. denied*, 516 U.S. 1029 (1995).  In that case, we suggested that a downward departure could not be justified on a finding that the subject crime was a disproportionately small part of the overall criminal conduct.  *Id.* at 1391-92.  Willey is inapplicable to the present case.

In *Willey* it was the defendant who appealed the district court's refusal to grant a downward departure, and we denied that appeal based largely on the principle that "[a] district court's refusal to grant a downward departure provides no basis for appeal."  *Id.* at 1391.  More importantly, even if our language in *Willey* could be read as casting doubt on the permissibility of

**40**

the district court's first factor, that language is no longer controlling authority in light of *Koon*. In *Koon* the Court made clear that the Sentencing Commission "chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations which might bear on the decision to depart." *Koon*, 518 U.S. at 94. Thus, to the extent that *Willey* conflicts with *Koon*, *Willey* is no longer binding precedent.

Our conclusion comports with the expressed intent of the Sentencing Commission. The Commission has stated that with the exception of only a few forbidden factors, it "does not intend to limit the kinds of factors . . . that could constitute grounds for departure in an unusual case." U.S.S.G. Ch. 1, Pt. A, intro. comment 4(b). The Guidelines are intended to provide the district courts with the flexibility needed to address the "unusual cases outside the range of the more typical offenses for which the guidelines were designed." *Id.*

In light of *Koon*, and considering "the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission," 18 U.S.C. § 3553(b), we decline the government's invitation to declare, categorically, that the district court's reliance upon the fact that the money laundering was incidental to the gambling operation was an impermissible basis for departure under the Guidelines.

Having concluded that the district court relied on permissible factors, we move to the second inquiry in our departure analysis, whether the district court's two factors, when viewed in light of the evidence, remove this case from the heartland of the Guidelines.  Since the factors are unmentioned in the Guidelines, we "must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland."  *Koon*, 518 U.S. at 96 (citation and quotation omitted).  That question is highly factual, so we review the district court's findings with substantial deference.

In considering the defendants' motion for downward departure, the district court concluded that this was not a typical money laundering case.  The court observed that the defendants had received over $20,000,000 in gross wagers over the course of the gambling operation, but had laundered only $500,000, or roughly three percent.[14]  The district court further

---

[14]    The government assails this finding on appeal, alleging that it was incorrect for the district court to compare the amount of laundered money to the amount of total wagers.  The government alleges instead that the district court should have compared the amount of laundered money against the likely profits of the gambling organization, roughly $1,000,000.  We fail to see the logic of that argument.  Criminal organizations need to launder not just the profits from the criminal enterprise, but presumably the gross revenues as well.

found that the defendants' conduct was unusual because they never used the laundered money to finance other criminal activities.[15] Finally, the district court considered its decision to depart in light of the statutory purposes of sentencing. *See* 18 U.S.C. § 3553. Referring specifically to 18 U.S.C. § 3553(a), the Court found that its decision to depart would reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence. *Id.*

Significantly, in departing the district court did not ignore the money laundering convictions and only consider the defendants' sentences under the illegal gambling provisions. Instead, the district court used the applicable offense levels for money laundering as its baseline, and then departed to an offense level of 21, a far cry from the base offense level of 12 for illegal gambling. Thus, this was certainly not a case where the district court disregarded an applicable Guidelines range in favor of another it preferred. *See* U.S.S.G. § 5K2.2 commentary ("dissatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the

---

[15]    The government takes issue with this finding as well, asserting that "[i]t would be safe to say that most money laundering cases are based on only one specified unlawful activity." We trust that this is the government's belief. But when we review the district court's decision to depart, it is the district court's judgment which is due substantial deference, not the government's.

applicable guideline range").[16]

Given the district court's special competence in making the refined factual comparisons necessary to the determination of whether to depart in this case, *see Koon*, 518 U.S. 98-99, we are not inclined to substitute our judgment for the considered findings of the district judge. Accordingly, we conclude that the district court did not abuse its discretion in finding the facts of this case atypical and a proper basis for a departure. We quote a passage from *Koon* which bears repeating:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States District Judge. Discretion is reserved within the Sentencing Guidelines, and reflected by the standard of appellate review we adopt.

*Koon*, 518 U.S. at 113. Consistent with that principle, and in view of the applicable Guidelines provisions, we affirm the district court's downward departure in this case.


VIII.

The defendants also allege that they were denied a fair trial

---

[16]     We find the degree of the district court's departure entirely reasonable, and commend the district court for striking a middle ground.

based on a laundry list of alleged mistakes by the district court. That claim is meritless.  Mark Threadgill also alleges that there was insufficient evidence supporting his conviction for conspiracy to commit money laundering.  He also contends that the district court erred in sentencing him to 42 months imprisonment because he withdrew from the conspiracy, and the scope of the conspiracy was not foreseeable to him.  Alternatively, he asserts that the district court should have reduced his sentence because he was a minor participant.  Having reviewed those arguments in light of the record and applicable law, we find no cognizable grounds for relief.

IX.

We affirm the defendants' convictions and sentences in all respects.

EDITH H. JONES, Circuit Judge, dissenting in part:

Because I disagree that these defendants' money-laundering is outside the "heartland" of such offenses, I respectfully dissent only from the majority's downward departure holding. The district court's departure reduced these defendants' exposure by 40% to 75% of the otherwise applicable guideline range.

The Sentencing Guidelines were structured to carve out a "heartland" of "typical cases embodying the conduct that each guideline describes." In typical criminal cases, courts are to impose a sentence within the range set by the guidelines; only if the facts of a particular case render it unusual or "one to which a particular guideline linguistically applies but where conduct significantly differs from the norm" are courts permitted to depart from the guidelines and impose a sentence outside the range. In commentary, the Commission states that "despite the courts' legal freedom to depart from the guidelines, they will not do so very often." U.S.S.G. ch. 1, pt. A (4)(b).

In <u>Koon v. United States</u>, the Supreme Court directed the courts to ask four questions when considering whether a particular case is atypical for departure purposes:

1.  What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?

2.  Has the Commission forbidden departures based on those factors?

3.  If not, has the Commission encouraged departures based on those factors?

4.     If not, has the Commission discouraged departures
       based on those factors?

518 U.S. 81, 95, 116 S. Ct. 2035, 2045 (1996) (quoting United States v. Rivera, 994 F.2d 942, 949 (1st Cir. 1993); see also United States v. Hemmingson, 157 F.3d 347, 360-61 (5th Cir. 1998); United States v. Winters, 105 F.3d 200, 205 (5th Cir. 1997). District courts must articulate "compelling facts necessary to satisfy the very high standard" of departures based on "outside the heartland" reasoning.  Winters, 105 F.3d at 208.

The district court justified its departure because the defendants' money laundering was "incidental" to gambling and because they allegedly did not recirculate the laundered money into the gambling business.  As such factors are not mentioned by the Guidelines in connection with departures, the courts must "consider the 'structure and theory of both relevant individual guidelines and the Guidelines taken as a whole' and decide whether the factor[s are] sufficient to take the case outside the heartland." Hemmingson, 157 F.3d at 361 (quoting Rivera, 944 F.2d at 949).  It is important to note that departures based on grounds not mentioned in the guidelines, as in this case, should be "highly infrequent." Id. (quoting U.S.S.G. ch. 1, pt. A (4)(b)).

Neither the district court's nor the panel majority's reasoning is persuasive.  In no sense can the money laundering here be deemed "incidental" or somehow divorced from the conduct of the illegal enterprise.

47

The district court considered the laundering of a half million dollars "incidental" in relation to the overall $20 million in bets placed with the Threadgills. To any average observer, a half million laundered dollars is a lot of money. In fact, in a recent telemarketing case, one defendant was sentenced to 60 months imprisonment -- much longer than the 42 months imposed here -- for laundering only $3,300! United States v. Leonard, 61 F.3d 1181 (5th Cir. 1995). Moreover, the devices used by the defendants -- checks payable to non-existent names and run through a legitimate front business -- embody the classic laundering scheme.

Beyond this, the court might more usefully have compared the amount actually laundered (about $500,000) with the total profits the defendants could have potentially laundered, which were around 1 million dollars,[17] rather than the $20 million in the whole scheme. If the profit approach makes sense at all, then comparing the laundering with the actual profits reflects the defendants' substantial efforts to conceal their source of income.

Rejecting the government's profits argument, the majority observes, "[c]riminal organizations need to launder not just the profits from the criminal enterprise, but presumably the gross revenues as well." Infra p. 41 n.14. I fully agree. To the

---

[17]According to the government, the reason the appellants could not have laundered the full $20 million is because they earn money by charging a 10% fee (called "juice") to the losing gamblers. Thus, assuming they were "even" (had equal bets on each side of the wager), $20 million in wagers would net $1 million.

48

extent the defendants laundered the full amount of their gambling revenues ($20 million) by recycling money from losers to winners for a percent of the proceeds, then it cannot possibly be said that the amount of money laundered was "incidental."  The majority cannot have it both ways.  Either the government is correct and the amount of profit that could have been laundered was $1 million, making the $500,000 actually laundered proportionately more significant, or, as the majority notes, all of the money taken in by the operation was laundered, negating the district court's finding that the amount laundered was insignificant.  Regardless which reasoning is adopted, this factor used by the district court to conclude that the money laundering was atypical cannot be upheld.

The district court also departed downward because "[t]here is no evidence that the Defendants used any of this money to finance any other criminal enterprise . . . ."  This is wrong. From a common-sense standpoint, a typical purpose for operating an illicit gambling ring is to make easy money for personal use--not to fund other criminal ventures.  There is nothing unusual about an illegal gambling conspiracy that takes its profits for personal consumption instead of using them as seed money to fund other criminal ventures.  See e.g., United States v. LeBlanc, 24 F.3d 340, 346 (1st Cir. 1994); United States v. Termini, 992 F.2d 879 (8th Cir. 1993).

49

More generally, nothing about the appellants' gambling enterprise and associated money laundering takes the case outside the heartland of money laundering cases. Congress passed the Money Laundering Control Act of 1986 to fill "the gap in the criminal law with respect to the post-crime hiding of ill-gotten gains," United States v. Johnson, 971 F.2d 562, 569 (10th Cir. 1992) (quoting United States v. Edgman, 952 F.2d 1206, 1213 (10th Cir. 1991)), and intended to "criminalize a broad array of transactions designed to facilitate numerous federal crimes, including illegal gambling." LeBlanc, 24 F.3d at 346; see also Hemmingson, 157 F.3d at 361 ("[T]he money laundering guideline primarily targets large-scale money-laundering, which often involves the proceeds of drug trafficking or other types of organized crime."). The facts of this case fall well within the contemplation of Congress when it passed the money laundering statute: The appellants collected large amounts of cash to run an illicit gambling operation and, with the complicity of an experienced accountant, deposited the proceeds in a bank in such a way as to evade currency reporting requirements and maintain the guise of conducting legitimate business transactions. See LeBlanc 24 F.3d at 346. Since the district court did not sufficiently "articulate relevant facts and valid reasons why the circumstances of this case were of a kind or degree not adequately considered by the Guidelines," Winters, 105 F.3d at 208, I can see no basis for distinguishing this case from other similar money laundering cases. See e.g. LeBlanc, 24 F.3d at

50

346-47 (reversing a district court's decision to depart downward in a gambling/money laundering case because the defendants' acts were typical of such cases).

Since the facts of this case and factors relied on by the district court are not "highly infrequent," U.S.S.G. ch. 1, pt. A (4)(b), but in fact are typical of money laundering, I respectfully dissent from the majority's decision to uphold the downward departure.