# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 22, 2011

Lyle W. Cayce
Clerk

No. 09-20762

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

DONG DANG HUYNH,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas, Houston
USDC No. 4:05CR351-2

Before REAVLEY, BENAVIDES, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

This is a direct criminal appeal from convictions for money laundering, conspiracy to commit money laundering, and conspiracy to defraud the United States by failing to file currency transaction reports. 18 U.S.C. §§ 1957, 1956(h), and 371. Finding no reversible error, we AFFIRM.

I.   BACKGROUND

The defendant-appellant, Dong Huynh (Dong), immigrated to the United States in 1982 and became a naturalized United States citizen in 1991. Dong

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-20762

founded US Tours and Remittance (US Tours), which did business as both a travel agency and a money remittance service. The majority of US Tours' travel business consisted of traveling to Vietnam. The money remittance services were utilized primarily by persons of Vietnamese heritage sending money to Vietnam. Dong established nine US Tours offices in California and Texas. As the head of US Tours, Dong determined the hours and pay for the employees. Clientele would bring their money to US Tours, and the money would be deposited into the company's bank accounts and then transferred to Vietnam for a fee based on a percentage. Federal banking regulations require that a currency transaction report (CTR) be filed any time the transfer of cash was $10,000 or more. In Texas, state law required reporting cash transactions more than $3,000. It is undisputed that Dong was aware of these reporting requirements.

In 2003, Canadian authorities alerted the FBI that US Tours was laundering money for Thi Phuong Mai Le (Mai Le), who was a Canadian citizen. The Canadian authorities shared their information with the FBI, including audio of wiretapped calls. The FBI also obtained warrants to wiretap phones and searched US Tours' records. The FBI conducted a sting operation, and Duc Huynh (Duc), Dong's nephew and manager of the Houston branch of US Tours, agreed to accept $610,000 from a cooperating witness who represented that the proceeds were from illegal activity. Duc and others, including Dong, were indicted for failing to file CTR's. Ultimately, the charges against Dong were dismissed and accordingly he was not prosecuted for the charges stemming from the sting operation. Duc, however, pleaded guilty to that indictment and cooperated with the government.

Subsequently, a grand jury in the Southern District of Texas issued another indictment charging that during the time period from January 2003 through March 2004, Dong and Mai Le conspired to launder money generated

2

from the sale of controlled substances, committed 11 substantive acts of money laundering, and conspired to defraud the United States by failing to file CTR's.

At Dong's trial, the evidence demonstrated that Kiet Duc Ha (Ha) was a Canadian drug dealer involved with Mai Le's business. Mai Le and Ha recruited couriers to transport large amounts of cash from drug sales to US Tours in Houston. At Mai Le's request, Tuan Nguyen (Nguyen) traveled from Orlando, Florida, to Houston in December 2002 and delivered a "few hundred thousand" dollars in cash to US Tours. Nguyen would usually call Dong to arrange the meeting once he arrived in Houston; however, on this occasion, Dong was not at US Tours. Instead, someone named Ms. Phan accepted the cash at US Tours. After Ms. Phan and Nguyen counted the money, Nguyen called Mai Le to let her know that he had successfully delivered the money to US Tours. Although Nguyen had never before met Ms. Phan, she did not give him a receipt for the deposit of this "few hundred thousand" dollars.

In January 2003, Nguyen picked up money as directed by Mai Le from an individual in New York City. In addition to the money, Nguyen received a free bag of marijuana. Still acting as a courier for Mai Le, Nguyen also picked up money in North Carolina and a third location on the East Coast. Nguyen and a friend named Tuan Phan drove the money to Houston, arriving in the early morning hours. Dong let Nguyen inside the office at US Tours. Nguyen personally delivered $562,400 in cash to Dong at US Tours. Nguyen carried it in "a big carton box" or bag. The money consisted of "crumpled and old bills" that had been "packed up in different ways." Dong and Nguyen counted the cash together. Nguyen testified that Dong never asked for a driver's license, social security number, or date of birth.

Subsequently, Mai Le's cousin, Dieu Xuan Hoang (known as Hoang or Bi), acted as a courier and picked up $500,000 in North Carolina and transported the cash, which was rubber-banded bundles of bills, in an appliance box to US Tours

in Houston.   After the money was delivered to US Tours, Dong called Duc to make sure it had been received.

Quy Hanh Luu (Luu) also acted as a courier for Mai Le and transported the illegal drug Ecstasy to a restaurant in New Orleans.  Upon arrival at the restaurant, he picked up cash from previous drug sales, drove to US Tours in Houston, and deposited the cash.  Luu testified that in October 2003, while traveling from New Orleans to Houston with $100,000 in cash, the state police stopped him for a traffic violation and confiscated the money.

Similarly, in August 2003, at Mai Le's request, Hoang collected $133,000 in Seattle and was taking the money to deposit at a US Tours in Oakland, California.  Hoang was stopped by the police and a canine alerted to the scent of drugs on the cash.  The police detained Hoang and seized the money.  Hoang called Mai Le, who in turn called Dong.  During these taped phone calls, Dong, referring to the seized money, said:  "That's my money" and directed Hoang to delete or throw away his cell phone.  Dong said if he did not, "we're dead."  Dong directed Hoang to stick to the story he had previously told the police–that a relative in Vietnam had sent him money to open a jewelry store.

The evidence also demonstrated that Dong instructed his employees with respect to recording the deposits from Mai Le and other "special customers" who were repeat customers bringing large amounts of cash.  When Duc began working for Dong in the Houston branch of US Tours, Dong informed Duc that certain people would be bringing large amounts of cash.  Duc was aware that the regulations required any deposit over $10,000 to be reported.  However, Dong did not instruct him to ask for the customer's name, social security number, or driver's license number.  Instead, Dong told him to "just take the money."  Dong instructed Duc to divvy up the large quantities of cash into smaller amounts and deposit funds in consistent amounts on a daily basis to avoid suspicion.  The funds in US Tours' bank accounts would be transferred a few times a week to the

account of Cuu Kim Son, a business in Vietnam run by Dong's brother.  In a taped call, Dong instructed Duc to move some of the money from the Houston branch to the Arlington branch.  Duc testified that they needed to do so because the Houston branch "had so much money we cannot handle it."  During the call Dong advised Duc to "[r]emember that the deposit will be in the federal record so we cannot put it in carelessly."  Duc understood Dong to mean that "we should not deposit too much" in a single day.  Dong instructed Duc to make a record of deposits from customers who deposited small amounts so that there would be a record "in case the bank inspect[s] it."

Sinh Dat Nguyen, who was not charged with respect to the instant offenses, was US Tours' accountant.  Dong made sure that the accountant was unaware of the secretive operations.  Dong had Duc record only the money deposited in some of US Tours' bank accounts.  Dong had Duc create two sets of ledgers to falsely state that the deposits were below $3,000.  During the time period from January of 2003 through March of 2004, the Houston branch of US Tours deposited over $24 million from Dong's special customers, including Mai Le, without filing a single CTR.

On one occasion, Duc asked Dong for permission to accept a last-minute $250,000 deposit from a special customer.  Duc testified that he had to secure permission from Dong "[b]ecause that's a large amount of money."  Dong told Duc to "charge a price that's worthwhile" and laughed about the ability to double the fee.

Dong testified at trial that Duc actually ran US Tours.  Dong's testimony also sought to point the finger at Dong Phan, Duc's brother-in-law, as a likely leader of the illicit operation.  Dong also offered explanations for the incriminating remarks he had made on the recorded phone calls.  For instance, he claimed that he directed Hoang (who had had money seized by the police) to delete the numbers from his cellphone because he feared that the thieves who

had robbed Hoang would track him by "scanning" his phone. Dong claimed that he told Mai Le to deposit money in uneven amounts under $9,000 so that US Tours could identify it as Mai Le's money.

After hearing the evidence and closing arguments, the jury convicted Dong of conspiring to launder money, conspiring to fail to file CTR's, and seven of the remaining substantive money laundering counts. The district court sentenced Dong to a 264-month term of imprisonment, which was within the sentencing guideline range. Dong now appeals.

II.    ANALYSIS

A.    Prosecutor's Use of Co-Conspirators' Guilty Pleas

Dong contends that the government improperly used the guilty pleas of two of his co-conspirators, Luu and Nguyen, as substantive evidence of his guilt. As Dong acknowledges, because counsel made no such objection in the district court, our review is for plain error. *See* Fed.R.Crim.P. 52(b). Before an appellate court can correct an error not raised below, there must be: (1) error; (2) that is plain; and (3) that affects substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). If all three prerequisites are met, the Court may exercise its discretion to correct a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *Id.*

A co-conspirator's guilty plea is not admissible as substantive proof of a defendant's guilt; however, this Court has "recognized an exception when the record reflects a defense strategy that relies on the co-conspirator's guilt." *United States v. Samak,* 7 F.3d 1196, 1198 (5th Cir. 1993). More specifically, "a defendant will not be heard to complain of its admission when he instigates such admission, or attempts to exploit the evidence by frequent, pointed, and direct references to the co-conspirator's guilty plea." *Id.* This Court considers the following factors when determining the admissibility of a co-conspirator's guilty plea: "(1) presence or absence of a limiting instruction; (2) proper evidentiary

purpose in introducing the guilty plea; (3) improper use of the guilty plea as substantive evidence of the defendant's guilt; and (4) whether the introduction was invited by defense counsel." *Id.*

As to the first factor, Dong's defense counsel did not request a limiting instruction regarding the prosecutor's use of the co-conspirator's guilty pleas.[1] "Ordinarily, when the jury learns of a codefendant's guilt for the same or similar offenses, and the defense counsel does not request that a curative instruction be given, the failure of the trial judge to give one will not require reversal." *United States v. DeLucca,* 630 F.2d 294, 299 (5th Cir. 1980). "Only in those rare situations in which other 'aggravating circumstances' have exacerbated the prejudice will the failure to give cautionary instructions result in plain and reversible error." *Id.* The government, however, does not concede that the instructions were necessarily inadequate. Instead, the government points to the court's charge instructing the jury with respect to considering the testimony of a cooperating witness: "The testimony of a witness convicted of a crime who provides evidence against the Defendant with the hope of receiving a lesser sentence than one he would, otherwise, receive must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses." In his reply brief, Dong responds that those instructions are relevant to the co-conspirators' *credibility* but do not instruct the jurors that Dong's co-conspirators' guilty pleas cannot be used as substantive evidence of his guilt. In a somewhat similar plain error case, this Court held that a jury charge instructing that evidence of witnesses' prior convictions was to be considered "as reflecting upon their credibility as witnesses only" was "sufficient to avoid jury consideration of [the testifying witness's] plea as relevant to [the defendant's] guilt or innocence." *United States v. King*, 505 F.2d 602, 606, 609 (5th Cir.

---

[1] We note that Nguyen and Luu pleaded guilty to charges that were in a separate indictment from the one charging Dong.

1974).  Of course, the charge in the case at bar did not limit the jury to *only* considering the convictions in terms of credibility.  However, we note that the court also instructed the jury that it was not to be "concerned with the guilt of any other person or persons not on trial as a Defendant in this case."  All in all, we conclude that this factor does not weigh strongly in favor of either party.

The second factor favors the government because "[p]reemptively introducing a plea to counteract anticipated defense efforts at impeachment is a proper purpose."  *United States v. Setser*, 568 F.3d 482, 494 (5th Cir. 2009).  Here, during opening statement, defense counsel, referring to Dong's co-conspirators, stated that they had pleaded guilty "in exchange for the length of time that they would spend behind bars, and you will hear from these people who are still trying to gain some sort of advantage from their sentence as a consequence of being in the system to the prosecution."  Indeed, defense counsel, referring to Nguyen by name, referred to him as a "convicted felon."  Thus, the government had a proper purpose in preemptively questioning Nguyen and Luu about their guilty pleas on direct examination.

With respect to the third factor, Dong asserts that the government improperly used the co-conspirators' guilty pleas as substantive evidence of his guilt.  He points to the prosecutor's questioning of Nguyen and Luu regarding their guilty pleas. The prosecutor asked both Nguyen and Luu whether they had pleaded guilty to money laundering.  The prosecutor also questioned Luu with respect to his guilty pleas for drug trafficking and perjury.  This questioning was relatively brief in that it covered a few pages out of a total of over 100 pages of the prosecutor's examination of these two witnesses.  Further, our review of the questioning leaves us with the impression that the prosecutor was attempting to demonstrate for the jury whether the witnesses were hoping to gain favorable treatment for their testimony.  In response to the government's questioning, Nguyen testified that he was cooperating and hoped to obtain a sentence

reduction based on his testimony.  Luu, however, testified that he was not a cooperating witness and had no agreement with the government in exchange for his testimony.  We conclude that the government did not improperly use the guilty pleas as substantive evidence of guilt during the examination of the witnesses.  However, during closing argument, the government stated that Luu "pled guilty to perjury because he said that money was not drug money."  "So it clearly was drug money and he pled guilty for lying about it and saying it wasn't. So it should be very clear."  This closing argument improperly relied upon Luu's guilty plea as substantive evidence that the source of the laundered funds was illegal.  In other words, that argument improperly used Luu's guilty plea to prove that the laundered money was drug-trafficking proceeds.  In sum, although the government properly questioned the witnesses regarding their guilty pleas, it improperly relied upon Luu's guilty plea during closing argument. Under those circumstances, this factor weighs in favor of Dong.

Finally, defense counsel invited the use of the guilty pleas by referring to them in his opening statement.  During opening statement, defense counsel generally referred to the testifying witnesses and stated that the government offered "to resolve [their cases] short of trial and in exchange for the length of time that they would spend behind bars, and you will hear from these people who are still trying to gain some sort of advantage from their sentence as a consequence of being in the system."

In addition, defense counsel cross examined Nguyen regarding his plea of guilty, inquiring whether he understood that:  "If the prosecutors take the position that you've been cooperative, they can pass it on to your [sentencing] judge; if they take the position that you haven't been, they'll so indicate." Defense counsel questioned Nguyen further regarding whether his possible sentence reduction depended on the prosecutor or the judge.  Defense counsel asked "have you, since that time of your entering the plea of guilty, gone to

Mississippi to answer any charges there that were filed against you for the possession of the marijuana?" Subsequently, defense counsel questioned Nguyen about when he had pleaded guilty and his meeting with the prosecutors: "Didn't you tell that [Quang was buying cashier's checks] to the law enforcement people after you entered your plea of guilty?" "And you did so for the purpose of trying to demonstrate to the prosecutors that you were trying to be cooperative, weren't you?" Defense counsel also questioned Nguyen regarding whether he "wrote a letter to the federal judge that you pled guilty to." With respect to Luu, the other co-conspirator, defense counsel questioned him about his perjury conviction. Further, during closing argument, defense counsel referred to Luu's plea of guilty to perjury. In light of defense counsel's use of the guilty pleas throughout trial, we find this factor weighs in favor of the government.

To summarize, with respect to the first factor, although the jury instructions were incomplete, Dong's counsel failed to request the remainder of the proper limiting instruction. With respect to the second factor, the prosecutor's preemptive questioning about the guilty pleas served a proper evidentiary purpose. As to the third factor, although the government properly questioned the witnesses regarding their pleas, the prosecutor improperly argued that Luu's guilty plea proved that the money was drug proceeds.[2] As to the fourth and final factor, defense counsel exploited the co-conspirators' guilty pleas during opening statement, cross examination, and closing argument. A "defense strategy that itself heavily relies on the guilty pleas with 'frequent, pointed, and direct references,' defeats subsequent attempts to claim error in the government's use of the pleas." *See Setser,* 568 F.3d at 494 (quoting *United States v. Leach*, 918 F.2d 464, 467 (5th Cir. 1990)). Here, the second and fourth

---

[2] Even assuming this particular instance constituted error that was plain, we do not find that it affected Dong's substantial rights in light of the other evidence demonstrating that the funds were derived from an illegal source.

factors weigh in favor of the government.  This Court has held that when two factors weigh in favor of finding that it was proper to admit the guilty plea, "it is not possible" to find plain error.  *United States v. Murray,* 988 F.2d 518, 528-29 (5th Cir. 1993).  Accordingly, we are persuaded that Dong has failed to show that the district court committed plain error in allowing the use of Nguyen's and Luu's guilty pleas.  In any event, the in-court testimony of Nguyen and Luu and the other evidence at trial is so overwhelming as to guilt that any use of the guilty pleas did not affect Dong's substantial rights.

### B.    Sufficiency of the Evidence

Dong was convicted of conspiring to commit money laundering in violation of § 1956(h).  "To establish conspiracy to commit money laundering, the government must prove (1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose."  *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006); *see also United States v. Guillermo Balleza*, 613 F.3d 432, 433 n.1 (5th Cir. 2010) (clarifying that the Supreme Court has held that an overt act is not an element of conspiracy to launder money under § 1956(h)).

Because Dong moved for judgment of acquittal at the close of the government's case, the standard of review is whether "a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt."  *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996).  This Court considers "the evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the prosecution."  *Id*.  This Court does not weigh the evidence or assess the credibility of witnesses.  *Id*.  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except

No. 09-20762

that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *Id*.

### 1. Drug Proceeds/Profits

Dong first contends that the government failed to produce sufficient evidence that the instant financial transactions involved "profits" of unlawful activity.  He contends that the evidence proved that the monies were gross receipts of the drug trafficking–not actual profits.  Dong's contention is based on the Supreme Court's opinion in *United States v. Santos*, 553 U.S. 507 (2008).  In *Santos*, a plurality of four justices interpreted the term "proceeds" in § 1956 to mean "profits" instead of "gross receipts."  *Id*. at 513-14.  Although Justice Stevens concurred in the plurality's judgment, he did not concur in the opinion's conclusion that "proceeds" *always* means "profits."  *Id*. at 524-28.  Instead, Justice Stevens "would interpret 'proceeds' in the statute to mean one thing in some criminal contexts and another thing in other criminal contexts." *United States v. Brown*, 553 F.3d 768, 783 (5th Cir. 2008).  More specifically, Justice Stevens agreed with Justice Alito's dissenting opinion that the "legislative history of § 1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband." *Santos*, 553 U.S. at 525-26 (Stevens, J., concurring in the judgment).  Here, the evidence demonstrated that Dong was laundering proceeds from drug trafficking through his corporation, US Tours.

In a recent opinion, this Court held that because Justice Stevens' concurrence is on the narrowest grounds, his opinion "controls and therefore determines the scope of the Court's holding." *Garland v. Roy*, 615 F.3d 391, 399 (5th Cir. 2010).[3]  As Dong concedes in his reply brief, applying Justice Stevens' analysis forecloses the argument that the government was required to prove that

---

[3] In fact, the plurality expressly recognized the "the *stare decisis* effect of Justice Stevens' opinion." *Santos*, 553 U.S. at 523.

the laundered money constituted profits from drug trafficking in the instant case. *See also United States v. Smith*, 601 F.3d 530, 544 (6th Cir. 2010) (opining that "*Santos* itself makes clear that it does not apply to the present situation [*i.e.*, conspiracy to distribute cocaine], and any error in not instructing the jury that 'proceeds' means 'profits' was not plain"). Accordingly, Dong's claim of insufficient evidence based on failure to show that the laundered money was drug profits is without merit.

## 2.   Concealment

Dong next contends that the government failed to adduce sufficient evidence of concealment to sustain a conviction for "money laundering concealment under 18 U.S.C. § 1956(a)(1)(B)(i)." However, as the government points out, Dong was not convicted of violating § 1956(a); instead, he was convicted of conspiracy to commit money laundering in violation of § 1956(h), and substantive counts of money laundering in violation of § 1957. Neither § 1956(h) nor § 1957 contains an element of concealment. "It is settled law that conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy." *United States v. Threadgill*, 172 F.3d 357, 367 (5th Cir. 1999). Therefore, this Court has "consistently held that a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit." *Id.* Accordingly, the government did not have to prove concealment to sustain Dong's conspiracy conviction under § 1956(h).[4]

---

[4] Nonetheless, in his reply brief, Dong asserts that because the jury charge actually required a finding that Dong knew the transaction was designed to conceal the nature of the proceeds, the evidence must conform to the charge. The jury was instructed to find more than was required under Fifth Circuit law. Dong was not harmed by this instruction; instead, it was favorable to him. *Cf. United States v. Jackson*, 983 F.2d 757, 768 (7th Cir. 1993) (declining to reverse conviction because charge actually benefitted defendant by erroneously requiring jury to find more than required by statute).

No. 09-20762

### 3.     Knowledge of Unlawful Activity

Dong further argues that the evidence is insufficient to demonstrate that he knew the funds were the proceeds of unlawful activity.  He contends that the *only* evidence of his knowledge was contained in Mai Le's statements introduced through the testimony of FBI Agent Chiue.  We cannot agree that this is the only evidence of Dong's guilty knowledge.  For example, the evidence demonstrated that Dong personally received a delivery of $562,400 cash in a travel bag.  The bills were crumpled and held together by rubber bands.  In the context of determining whether a defendant *knowingly* possessed contraband, this Court has long considered a large amount of cash to be an indicator of guilty knowledge.  *See, e.g., United States v. Ortega Reyna*, 148 F.3d 540, 544 (5th Cir. 1998).  Indeed, it is a "common sense reality of everyday life . . . that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack." *United States v. $ 242,484.00,* 389 F.3d 1149, 1161 (11th Cir. 2004).

Additionally, when it was reported to Dong that Hoang, also known as "Bi," had been arrested and the money he was carrying seized, Dong instructed Mai Le to throw away "Bi's" cell phone or delete the phone numbers or they all were "dead."  Viewed in the light most favorable to the verdict, a rational jury could have easily concluded beyond a reasonable doubt that Dong had knowledge that the funds used were proceeds of illegal activity.

### C.     Trial Errors

### 1.     Preserved Error

Dong raises numerous trial errors.  Dong argues that the district court abused its discretion in allowing the government to elicit Agent Irey's testimony that she thought Dong's residence was worth more than $300,000.  Because the government's evidence did not directly connect Dong's home to the charged offenses, we conclude that the district court abused its discretion in allowing this

14

testimony over objection. *See United States v. Nill*, 518 F.2d 793, 802 (5th Cir. 1975) (explaining that "[a] man's wealth is wholly irrelevant to his guilt or innocence in a criminal prosecution unless the wealth is directly connected to the offense for which he is standing trial"). Nonetheless, we find that, in light of the overwhelming evidence of Dong's guilt, including the delivery to Dong of a box containing over $500,000 in cash, this brief testimony constitutes harmless error.[5]

Dong further argues that the district court erred in allowing the prosecutor to provide an oral summary of the testimony after the trial had been recessed several weeks due to defense counsel's illness.[6]  The district court overruled Dong's objection to allowing the prosecutor's summation.  However, the district court properly instructed the jury that the prosecutor's summation of the testimony was not evidence and that the jury should rely on its own recollection.  A "jury is presumed to follow the court's instructions." *United States v. Bieganowski*, 313 F.3d 264, 288 (5th Cir. 2002),  In light of this instruction, any error would be harmless.[7]

Dong also complains about the exclusion of a transcript that he sought to enter into evidence as a violation of his Sixth Amendment right to confrontation and an abuse of discretion.  The right to confrontation bars the admission of out-of-court testimonial statements unless the witness was unavailable to testify, and the defendant had a prior opportunity for cross-examination.  *Crawford v.*

---

[5]   Dong also contends that the district court erroneously allowed two hearsay statements attributed to police officers.  Our careful review of the challenged testimony leads us to conclude that neither statement constitutes hearsay.

[6]  Additionally, Dong contends that the district court abused its discretion in refusing to allow defense counsel to likewise give a summation.  However, our review of the record reveals no such request, and Dong does not provide a record citation.

[7]  We note that the district court allowed the jurors to take notes during the trial in an effort to aid them in their recall of the evidence.

No. 09-20762

*Washington*, 541 U.S. 36, 68 (2004).[8]  Here, the statements were not admitted into evidence.  Dong has not shown a Sixth Amendment violation.   Moreover, the district court did not abuse its discretion in denying the admission of the transcript without the "testimony of a qualified witness to authenticate and verify the translation." *United States v. Sutherland*, 656 F.2d 1181, 1201 (5th Cir. 1981).[9]

2.     Plain Error

Dong contends that the district court committed plain error by failing to instruct the jury with respect to the consideration to be given the expert testimony of Agents Chiue and Irey.  Because the complained-of testimony either was duplicative of other evidence or undisputed, Dong is precluded from showing that his substantial rights were affected.  *Olano*, 507 U.S. at 732-34.

Next, Dong contends that the admission of Mai Le's testimonial statements regarding the illegal source of the laundered money that came in through Agent Chiue's testimony violated his rights under the Confrontation Clause.[10]   The government responds that the error was invited by defense counsel's  cross examination of Agent Chiue.  We need not determine whether the error was invited because, in light of the other evidence discussed above

---

[8] If the government had introduced the transcript in question without the person who had translated the audiotapes, then that may have constituted a Confrontation Clause violation.

[9]     We further note that the district court gave the defense ample opportunity to challenge the reliability of the government's translations and counter with its own translation.

[10] The government does not even attempt to argue that the evidence was not testimonial in violation of the Confrontation Clause.

demonstrating that the funds were derived from illegal activity,[11] Dong cannot show that his substantial rights were affected under the plain error standard.

Dong also contends that Agent Irey's testimony constitutes impermissible bolstering that rises to the level of plain error. We reject this contention because, in light of the testimony establishing that Dong laundered money through US Tours, he has not shown that any error affected his substantial rights.[12]

### D.     Conflict of Interest

Dong contends that he received ineffective assistance of counsel because his trial counsel operated under an actual conflict of interest. On April 6, 2004, Dong, Duc, and five of Dong's other family members were charged with failing to file CTRs and money-laundering offenses. Dong retained Richard "Racehorse" Haynes (Haynes) and retired United States District Judge John Singleton (Singleton) as his attorneys. Dong paid for Walter Boyd (Boyd) to represent Duc and also paid the legal fees for the other indicted employees. The defendants entered into a joint-defense agreement requiring the sharing of relevant information.

Duc pleaded guilty to the conspiracy count on June 2, 2005. Eleven days later, Haynes and Boyd formed the law firm of Haynes, Boyd and Associates (Haynes & Boyd). Neither the attorneys nor the government advised the district

---

[11]    It should be noted that the government does not have to prove the specific illegal activity that generates the proceeds. *See* 18 U.S.C. § 1956(c)(1) ("the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law").

[12] Dong contends that the above claims result in cumulative trial error. Because Dong has not demonstrated that "constitutional errors so 'fatally infect[ed] the trial' that they violate[d] the trial's 'fundamental fairness,'" he is not entitled to relief under the cumulative-error doctrine. *United States v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009).

court of the new partnership. In June, Boyd accompanied Duc on two of his multiple debriefing sessions with the government.

The instant indictment, charging only Dong and Mai Le with various conspiracy charges was returned on August 24, 2005. At a March 2006 meeting with Dong and his counsel, FBI Agent Chiue made a presentation of the government's case including the expected testimony of its cooperating witnesses. During the same period, pursuant to the joint defense agreement, Boyd revealed to Haynes the information that Duc had provided in government debriefings. The partnership of Haynes & Boyd ended on May 7, 2007.

Dong's trial began on June 2, 2008, more than one year after Haynes & Boyd had disbanded. Boyd was not part of the defense team, did not know the trial was going forward, and did not attend the trial. Dong's defense was to blame the criminal conduct on Duc and Dong Phan, Duc's brother-in-law.

About one year after his conviction, Dong's newly retained counsel filed a notice of conflict and motion for a new trial based on Haynes & Boyd's dual representation of Dong and Duc. After a three-day evidentiary hearing, the district court found, contrary to Dong's allegation, "that Dong knew Duc had pleaded guilty, was cooperating with the government, and would testify against him at trial." The court determined that there was no actual conflict of interest because Haynes' "constructive representation of Duc" had "unambiguously terminated more than one year before" Dong's trial and the pre-trial representation had given Dong access to confidential information regarding Duc's cooperation. The court also concluded that Dong had failed to establish that any conflict of interest had an adverse effect on Haynes' performance either at the pre-trial stage or at trial.

Dong contends that he is entitled to a new trial because his counsel, Haynes, operated under an actual conflict before and during the trial that compromised Dong's defense. Dong further contends that the interest of Haynes

in representing Dong was in actual conflict with his former partner's interest in representing Duc.

As previously mentioned, the district court was not made aware of a potential conflict prior to trial. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Dong has not established an adverse effect from the alleged conflict of interest. "[T]o show adverse effect, a petitioner must demonstrate that some plausible defense strategy or tactic might have been pursued but was not, because of the conflict of interest." *Perillo v. Johnson*, 79 F.3d 441, 449 (5th Cir. 1996).[13]

To show adverse effect, Dong first contends that due to the joint representation, "Haynes was unable to debrief Boyd or Duc about Duc's case." At the evidentiary hearing, however, Boyd testified that, pursuant to the joint defense agreement, he "told Richard Haynes exactly what Duc had proffered" to the government. Boyd also testified that when the prosecutor asked him why Dong would not take the five-year "deal," he told the prosecutor that he "had no idea, that [he had] built a double 'Chinese wall' around this case, that [Dong's] case was [Haynes'] problem and not [his], and  [he] didn't want to know anything." Haynes testified that Dong was present for the prosecution's PowerPoint presentation of the evidence against him and knew Duc was going to testify against him at trial. After reviewing the government's evidence, both defense attorneys, Haynes and Singleton, "pleaded with Dong to accept the five years." The district court credited the attorneys' testimony, finding that Haynes & Boyd's partnership provided Dong with "information about Duc rather than

---

[13] We find it unnecessary to address whether an actual conflict of interest existed because we conclude that Dong has not shown that any such conflict adversely affected Haynes' performance.

vice versa." Because the evidence at the three-day evidentiary hearing supports this finding and refutes Dong's contrary assertion, Dong has not shown that it is clearly erroneous. *United States v. Thomas*, 120 F.3d 564, 571 (5th Cir. 1997).

Dong next contends that Haynes' "feeble cross-examination of Duc" demonstrates that the conflict had an adverse effect on counsel's performance. Dong asserts that Haynes should have cross examined Duc with respect to the benefits of his plea agreement, including Duc's 42-month sentence and the substantial downward departure he would receive if he fully cooperated and testified against Dong.[14] We reject Dong's contention that Haynes' cross-examination of Duc was feeble. The cross-examination covers 138 pages of transcript, and the prosecutor objected several times to Haynes' questions of Duc as "argumentative." Haynes questioned Duc about his marriage to Vivian Mai, a United States citizen, implying Duc committed immigration fraud because he married her to change his visa. Haynes also emphasized that although Duc was married to Mai, he lived with another woman, Thu Phan, with whom he fathered two children. Haynes questioned Duc about having two different sets of books, one at home and one at US Tours, and running a "side" business unbeknownst to Dong. Also, during cross-examination, Haynes was able to obtain Duc's confession to taking a computer from US Tours without having asked permission to do so. Finally, Duc admitted that he and Dong had had an argument, indicating that there was enmity between Duc and Dong.

Moreover, during the evidentiary hearing on the conflict of interest, Haynes explained that in his opinion, based on his observations of the jury, his cross-examination of Duc was a more effective way to impeach Duc than focusing

---

[14] We note that during direct examination, the prosecutor had elicited testimony from Duc that he had entered into an agreement to plead guilty and cooperate with the government. Duc testified that he had agreed to testify in court and hoped to receive a "lighter sentence" as a result of his cooperation. More specifically, Duc testified that he hoped to get his sentence reduced by "testifying here today."

on Duc's plea bargain. The district court accepted Haynes' explanation and ruled that Haynes' decision regarding cross-examination did not constitute a failure to pursue an alternate defense strategy. Further, the district court noted that, during closing argument, Haynes "pointed out that Duc was not an impartial witness because he stood to gain from testifying against Dong." Under these circumstances, Dong has failed to show that Haynes' impeachment strategy was an adverse effect caused by the alleged conflict of interest.

### E. Sentencing Issues

#### 1. Disparity of Sentences

Dong argues that his sentence is unreasonable, pointing to the "gross disparity between his sentence and the sentences of similarly situated defendants." Dong complains that his 264-month sentence exceeded the average sentence for money laundering (33.1 months) by a factor of eight. We reject these arguments because Dong has not shown disparity among similarly situated defendants. The disparity here is caused by the application of the sentencing guidelines as intended by Congress. *United States v. Candia*, 454 F.3d 468, 476 (5th Cir. 2006); *see also Guillermo Balleza*, 613 F.3d at 435 (sentence disparities between co-defendants who were convicted of different charges or who received departures for substantial assistance are not unwarranted disparities under § 3553(a)(6)). Moreover, the district court sentenced Dong within the guideline range, which is a presumptively reasonable sentence. *Candia,* 454 F.3d at 473. Dong has failed to overcome the presumption of reasonableness afforded his sentence.

#### 2. Double Jeopardy

For the first time on appeal, Dong claims a double jeopardy violation, contending that he was sentenced twice for the same conspiracy. After reviewing for plain error, we find no violation. To prevail on his double jeopardy claim, Dong must establish that his convictions violate the rule announced in

*Blockburger v. United States*, 284 U.S. 299, 304 (1932). "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Id.*

A "conspiracy to defraud the United States under 18 U.S.C. § 371 and a conspiracy to commit money laundering under 18 U.S.C. § 1956(h) require proof of different facts." *United States v. Tiedeman*, 14 F. App'x 124, 125 (2d Cir. 2001) (citing *Blockburger*, 284 U.S. at 304). In the instant case, Dong's conspiracy conviction pursuant to § 371 required "an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Freeman*, 434 F.3d 369, 376 (5th Cir. 2005). However, Dong's conspiracy conviction pursuant to § 1956(h) does not have such a requirement. *See Guillermo Balleza*, 613 F.3d at 433 n.1 (clarifying that the Supreme Court has held that an overt act is not an element of conspiracy to launder money under § 1956(h)). Further, a § 1956(h) conspiracy "requires proof of an intent to conduct a financial transaction that would affect interstate commerce–a fact not required to be proven for a Section 371 conspiracy." *Tiedeman*, 14 F. App'x at 125; § 1956(c)(4) (setting forth interstate commerce requirement). Accordingly, because there is authority for the proposition that Dong's two conspiracies constitute two offenses, and Dong points to no controlling contrary authority, Dong is precluded from showing plain error.

3.    Perjury Enhancement

Dong contends that the district court erred in enhancing his sentence under U.S.S.G. § 3C1.1 based on his alleged perjury during his testimony at trial. Dong claims that the court failed to make any of the following findings under the definition of perjury:  (1)  identifying the false testimony; (2) finding that the testimony concerned a material matter; and (3) finding that he testified

with a willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. Our Court has held that a "separate and clear finding on each element of the alleged perjury, although preferable, is not required." *United States v. Como*, 53 F.3d 87, 89 (5th Cir. 1995). In the instant case, the district court found that Dong took the stand and committed perjury and expressly adopted the findings of the PSR, which listed six statements under the heading "Obstruction of Justice." The district court stated that it "overrul[ed] all objections made to the PSR" and expressly adopted the PSR "as my own, both the findings of fact and the application of the Guidelines to the facts." The perjurious statements therefore were identified.

Further, these six false statements were material in that they would tend to affect the outcome of the trial. In other words, had the jury believed the perjured testimony, it would have been less likely to find him guilty. Finally, the district court observed the entire trial and expressed concern regarding Dong's trial testimony, stating that Dong was "making it up as he goes along." Clearly, this shows the court's determination that Dong's false testimony was not a result of confusion, mistake or faulty memory. We find no error in the sentencing enhancement pursuant to § 3C1.1.

### 4. Amount of Laundered Funds

The district court found that the amount of funds laundered by Dong was in excess of $7,000,000, thus increasing his base offense level by 20. Dong claims that the government "only offered evidence and sought to prove the amount of 'laundered funds' involved in Counts Two, Four, Five, Six, Ten, Eleven and Twelve, which totaled $1,471,401." The government responds that the court was entitled to rely upon relevant conduct and was not limited to the amount of laundered funds allegedly involved in those counts. The government asserts that the bank records and monthly computer spreadsheet from US Tours demonstrated that Mai Le sent almost $6,000,000 through US Tours' Houston

No. 09-20762

office between February 2003 and March 2004. Further, IRS Agent Irey testified that during January 2003, one ledger reflected approximately $1.8 million was laundered. Dong does not dispute that there was evidence that Mai Le deposited more than $7,000,000 in US Tours' accounts.[15]   Instead, he argues that the government failed to show that all of those funds were the proceeds of drug trafficking. "In determining whether a Guidelines enhancement applies, the district court is allowed to draw reasonable inferences from the facts, and these inferences are fact findings reviewed for clear error." *United States v. Coleman*, 609 F.3d 699, 708 (5th Cir. 2010).

Based on the evidence at trial, the district court did not clearly err in finding that the $7,000,000 deposited by Mai Le with US Tours were the proceeds of illegal activity. Indeed, at the sentencing hearing, in response to the objection regarding the finding of $7,000,000, the court stated as follows: "One of the advantages of trying a case is that you get to hear all the evidence and I think there's certainly ample evidence of that fact. So I'm going to overrule all of the objections." Moreover, Dong points to no evidence indicating that any of Mai Le's cash transactions involved legitimate business funds–as opposed to the proceeds of illegal activity. Dong has failed to show that the district court clearly erred in its calculation of the funds laundered.

III.   CONCLUSION

For the above reasons, the district court's judgment is AFFIRMED.

---

[15] Mai Le was a co-conspirator in this operation, and thus, her reasonably foreseeable actions in furtherance of the conspiracy were relevant conduct for sentencing purposes. *See* U.S.S.G. § 1B1.3; *United States v. Rodriguez*, 553 F.3d 380, 395 (5th Cir. 2008).